T.C. Memo. 1998-114

UNITED STATES TAX COURT

CHARLES C. DOCKERY, DONOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14915-96.                    Filed March 19, 1998.

<u>Philip Cook</u>, <u>Michelle Henkel</u>, and <u>Timothy J. Peaden</u>, for
petitioner.

<u>Willie Fortenberry</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined that petitioner has
gift tax deficiencies of $3,189 for 1992 and $512,073 for 1993.

The issues for decision are:

1.    Whether the fair market value in 1992 of Crossroads Insurance, Inc.'s stock that petitioner gave to his children was $628,619 ($704 per share), as respondent contends; zero, as petitioner contends; or some other amount.  We hold that it was $303 per share.

2.    Whether the fair market value in 1993 of Crossroads Insurance, Inc.'s stock that petitioner gave to his children was $1,286,961 ($1,010 per share), as respondent contends; $274,101 ($215 per share), as petitioner contends; or some other amount. We hold that it was $303 per share.

Unless otherwise specified, section references are to the Internal Revenue Code in effect for the years in issue.  Rule references are to the Tax Court Rules of Practice and Procedure.

## I.  FINDINGS OF FACT

### A.    Petitioner

Petitioner is Charles Dockery.  Petitioner's mailing address was Lakeland, Florida, when he filed the petition.

Paula Dockery is petitioner's wife.  Mavis Dockery is petitioner's former wife.  Carl Dockery is petitioner's son. Michele Jones (formerly Michele Renwald) is petitioner's daughter.

### B.    Crossroads Insurance, Inc.

Petitioner incorporated Crossroads Insurance, Inc. (Crossroads), under the Companies Law of the Cayman Islands on June 27, 1978.  Petitioner has been the majority shareholder and

chairman of the board of Crossroads since 1978. At all times relevant to this case: (1) The outstanding shares of stock of Crossroads consisted of 10,000 shares of common stock and 750,000 shares of 10 percent, noncumulative, redeemable preferred stock; and (2) the members of Crossroads' board of directors were petitioner and four minority shareholders: Paula Dockery, Mavis Dockery, Carl Dockery, and Michele Jones.

Crossroads is managed in Georgetown, Grand Cayman. It has no office in the United States. It is a controlled foreign corporation under section 957(b). Crossroads' customers are all in the United States.

Crossroads is licensed to write insurance in Florida and Louisiana. Each year, Crossroads files annual statements with Florida and Louisiana reporting the financial condition of its operations.

1.   The Reinsurance Industry

Crossroads is a reinsurer.[1] It is engaged in the business of providing aggregate "stop loss" workers' compensation reinsurance[2] to self-insurer pools (also referred to as funds).

---

[1] A reinsurer is an insurer who agrees to provide coverage of risks that a primary insurer has already assumed under an insurance contract with another party. 1 Couch on Insurance 3d, sec. 1:4, at 1-8 to 1-9 (1995).

[2] Reinsurance is an agreement between an insurer (the ceding company) and a second insurer (the reinsurer), under which the ceding company passes to the reinsurer some or all of the risks that the ceding company assumes through the direct underwriting
(continued...)

An aggregate stop loss reinsurance agreement subjects Crossroads to liability for workers' compensation claims above a preestablished "retention percentage". The retention percentage is the point at which Crossroads' liability on a reinsurance contract matures. For example, if a self-insurer fund collects $10 million in premiums and Crossroads' reinsurance agreement provides for an 80-percent retention point, the primary carrier's losses would be limited to $8 million, and Crossroads would pay all claims exceeding $8 million.

Self-insurer pools are formed under State law as an alternative to conventional insurance. Members of trade associations can form, and pay premiums to, pools owned by the members (rather than to an insurance company). Any profits are returned to the members.

"Unpaid claims", commonly called reserves for unpaid losses, are an insurer's estimate of the amount expected to be paid in the future to settle claims reported and incurred.

Workers' compensation reinsurance is "long-tail" insurance coverage because of the length of time before a reinsurer's obligations mature. Crossroads may not know if it had losses for aggregate stop loss workers' compensation reinsurance until 3 to 4 years after a policy year because it may take that long for

---

2(...continued)
of insurance policies. See Trans City Life Ins. Co. v. Commissioner, 106 T.C. 274, 278 (1996).

Crossroads to review payments made by the primary carrier. Crossroads may not make reinsurance payments until 5 to 6 years after a policy year because it does not pay until the primary carrier's paid claims reach the retention point. Crossroads may be paying claims for 8 to 10 years after the policy period ends.

2. Crossroads' Reinsurance Agreements With Self-Insurer Funds

From October 1, 1982, to October 1, 1987, Crossroads wrote stop loss workers' compensation reinsurance agreements for three self-insurer funds: The Oklahoma Retail Merchants Group Self-Insurers Association, the Oklahoma Employers Safety Group Self-Insurers Association, and the Florida Foliage Association Self-Insurers Fund.

Since October 1, 1987, Crossroads has written stop loss workers' compensation reinsurance agreements for four self-insurer funds: the Florida Retail Federation Self-Insurers Fund, the Employers Self-Insurers Fund (Florida) (ESIF), the Louisiana Retailers Association Self-Insurers Fund, and the Louisiana Employers Safety Association Self-Insurers Fund. These agreements have each generally been for 1 year. These self-insurer funds were established by Summit Consulting, Inc. (Summit Consulting).

On May 4, 1988, Florida's Treasurer and Department of Insurance issued a consent order restricting Crossroads from

reinsuring any Florida fund other than the Florida Retail Federation Self-Insurers Fund and ESIF.

 3. Crossroads' Retrocession Agreements

A reinsurance company can reinsure itself above an established retention point with another reinsurance or third-party insurance company. The third-party insurer assumes the risks for the retroceded policies (i.e., those policies the reinsurer retrocedes to the third insurer). This is a "retrocession" agreement.[3]

Beginning in 1988, Crossroads retroceded 50 percent of the risks of ESIF to U.S. Employers Insurance, Inc. (U.S. Employers), a company incorporated in the Cayman Islands and owned by ESIF. Petitioner has served on the board of directors of U.S. Employers since it was incorporated. Crossroads has also retroceded policies to Lloyds of London.

As of January 1, 1992, Crossroads had retroceded 45 percent of the risks of Florida Retail Federation Self-Insurers Fund, Louisiana Retailers Association Self-Insurers Fund, and Louisiana Employers Safety Association Self-Insurers Fund to Gulf Insurance Co., Ltd. (Gulf), a company incorporated in the Cayman Islands on

---

 [3] See Trans City Life Ins. Co. v. Commissioner, 106 T.C. at 278-279.

January 10, 1992, and owned by petitioner and Crossroads' minority shareholders.

### 4. Crossroads' Annual Statements

Crossroads reported on its 1991 and 1992 annual statements that it had surpluses of $6,372,038 for 1991 and $8,720,809 for 1992.

### a. KPMG Peat Marwick's Actuarial Reports

Crossroads began using KPMG Peat Marwick as an actuary to prepare Crossroads' loss reserves around 1988. KPMG Peat Marwick also audited Crossroads' financial statements. A different office of KPMG Peat Marwick audited Gulf's financial statements.

In analyzing Crossroads' reserves, KPMG Peat Marwick reviewed the following underlying claims data for each of the self-insurer funds: (i) Accident year cumulative amount of paid and incurred losses, at historical development points; (ii) accident year cumulative number of closed and reported claims, at historical development points; (iii) earned normal premium by accident year; (iv) recoveries from subrogation, second injury funds, and specific excess insurance, by accident year; and (v) all reinsurance policies with loss exposure.

After reviewing the historical data, KPMG Peat Marwick: (i) Applied standard actuarial loss development techniques, including

the Bornheutter-Ferguson method[4] to project ultimate values, by accident year, of each self-insurer fund; (ii) determined frequency and severity components; (iii) performed Monte Carlo simulations[5] of the underlying net losses to obtain the potential liability of each self-insurer fund at various confidence levels; and (iv) compared simulation results to the policy retention points and claim payments. KPMG Peat Marwick estimated that Crossroads' reserves were $22,000,000 as of December 31, 1991, and $30,400,000 as of December 31, 1992. KPMG Peat Marwick's reserve estimates included losses for retroceded policies.

### b. Crossroads' Reserves for Unpaid Losses

Crossroads' management established its reserves based on its analysis of the business environment and industry trends, claims experience, and the KPMG Peat Marwick actuarial reports. Crossroads recorded reserves in the amounts of $19,410,000 as of December 31, 1991, and $22,994,000 as of December 31, 1992, on its financial statements. These reserves were net of losses for retroceded policies. Crossroads' financial statements were

---

[4] The Bornheutter-Ferguson method is an actuarial technique used to estimate the value of a company's reserves by subtracting its paid losses from its reserves.

[5] Using the Monte Carlo simulation technique, KPMG Peat Marwick estimated Crossroads' potential liability by performing 500 simulations of Crossroads' underlying net ultimate losses for each fund year and sorting the results of the simulations from lowest to highest to estimate confidence levels.

prepared according to generally accepted accounting principles and statutory accounting principles.

C.   Summit Consulting, Inc.

Petitioner organized Summit Consulting in 1978 and was its president and majority shareholder until 1984 when he sold it to Alexander & Alexander Services, a worldwide brokerage firm.  As a condition of the sale, petitioner continued as president until January 1, 1986.  Summit Consulting is a third-party administrator of group self-insurance funds.

In October 1984, petitioner hired William B. Bull (Bull) to work for Summit Consulting.  From 1984 to 1986, Bull served as assistant to the president, vice president of operations, and executive vice president.  Bull became Summit Consulting's president and chief executive officer (CEO) on January 1, 1987.  As president and CEO, Bull was responsible for the profitability and management of the company.  Bull's experience in the insurance industry had focused predominantly on workers' compensation.  In the early 1990's, Bull was appointed to the Governor's Workers' Compensation Task Force in Florida to help reform the workers' compensation industry.

From 1978 to 1981, Summit Consulting established each of the four self-insurer funds reinsured by Crossroads in 1992 and 1993.  Summit Consulting was the third-party administrator of these

funds in 1992 and 1993. Summit Consulting administered the self-insurer funds, for which it received a fee of about 30 percent of the insurance premiums. It bought 1-year (accident year)[6] aggregate reinsurance policies from Crossroads for each of the self-insurer funds except ESIF. Crossroads sold reinsurance policies to Summit Consulting for the Florida Retail Federation Self-Insurers Fund, the Louisiana Retailers Association Self-Insurers Fund, and the Louisiana Employers Safety Association Self-Insurers Fund. Summit Consulting paid the reinsurance premiums for these three funds out of the money that it received as the funds' third-party administrator. Crossroads sold reinsurance policies directly to ESIF.

Petitioner was not part of Summit Consulting's management on January 1, 1992, or January 1, 1993.

In January 1996, ESIF bought Summit Consulting.

D.  Gulf Insurance Co.

Gulf was incorporated under the Companies Law of the Cayman Islands on January 10, 1992. Gulf was owned by petitioner and Paula Dockery, Mavis Dockery, Carl Dockery, and Michele Jones.

E.  Crossroads' Claims Paid and Reserves for Unpaid Losses

As of December 31, 1995, Crossroads' claims paid, reserves, and total expected losses for reinsurance policies written as of

---

[6] An accident year policy covers accidents that occur from Jan. 1 to Dec. 31.

December 31, 1991, net of losses for retroceded policies, were as follows:

| Taxable year ending | Cumulative claims paid[1] | Reserves for unpaid losses[2] | Total expected losses[3] |
|---|---|---|---|
| Dec. 31, 1991 | $3,473,000 | $19,410,000 | $22,883,000 |
| Dec. 31, 1992 | 4,183,000 | 19,258,000 | 23,441,000 |
| Dec. 31, 1993 | 9,348,000 | 14,094,000 | 23,442,000 |
| Dec. 31, 1994 | 12,135,000 | 12,756,000 | 24,891,000 |
| Dec. 31, 1995 | 16,939,000 | 6,908,000 | 23,847,000 |

[1] Cumulative claims paid were obtained from part 1 of schedule P of Crossroads' annual statements filed with the Departments of Insurance for the States of Florida and Louisiana for 1991 to 1995. For each year, cumulative claims paid is the net of columns 5 and 6 for policy years before 1992. Policy years after 1991 are excluded to obtain the relevant information for reinsurance policies written as of Dec. 31, 1991.

[2] Reserves for unpaid losses were obtained from part 1 of schedule P of Crossroads' annual statements filed with the Departments of Insurance for the States of Florida and Louisiana for 1991 to 1995. For each year, reserves for unpaid losses are the total of column 23 (column 22 for 1991 and 1992) reduced by reserves for policy years after 1991. Policy years after 1991 are excluded to obtain the relevant information for reinsurance policies written as of Dec. 31, 1991.

[3] Total expected losses are the sum of cumulative claims paid and reserves for unpaid losses.

As of December 31, 1995, Crossroads' claims paid, reserves, and total expected losses for reinsurance policies written as of December 31, 1992, net of retroceded policies, were as follows:

| Taxable year ending | Cumulative claims paid[4] | Reserves for unpaid losses[5] | Total expected losses[6] |
|---|---|---|---|
| Dec. 31, 1992 | $4,376,000 | $22,994,000 | $27,370,000 |
| Dec. 31, 1993 | 9,541,000 | 18,441,000 | 27,982,000 |
| Dec. 31, 1994 | 12,983,000 | 17,149,000 | 30,132,000 |
| Dec. 31, 1995 | 18,531,000 | 8,920,000 | 27,451,000 |

[4] Cumulative claims paid were obtained from part 1 of schedule P of Crossroads' annual statements filed with the Departments of Insurance for the States of Florida and Louisiana for 1992 to 1995. For each year, cumulative claims paid are the net of columns 5 and 6 for policy years before 1993. Policy years after 1992 are excluded to obtain the relevant information for reinsurance policies written as of Dec. 31, 1992.

[5] Reserves for unpaid losses were obtained from part 1 of schedule P of Crossroads' annual statements filed with the Departments of Insurance for the States of Florida and Louisiana for 1992 to 1995. For each year, reserves for unpaid losses are the total of column 23 (column 22 for 1992) reduced by reserves for policy years after 1992. Policy years after 1992 are excluded to obtain the relevant information for reinsurance policies written as of Dec. 31, 1992.

[6] Total expected losses are the sum of cumulative claims paid and reserves for unpaid losses.

Crossroads' shareholders are liable for tax on its income from selling reinsurance policies to self-insurer funds in the United States. Sec. 957(b). Crossroads pays dividends to its shareholders partly to enable them to pay taxes on their Crossroads' income.

F.   Economic Conditions in 1991-92

The workers' compensation market in Florida in 1991 and 1992 was chaotic. Insurance rates were rising about 20-25 percent per year and claims exceeded premiums.

G.   Petitioner's Gifts of Crossroads' Stock

On December 31, 1991, petitioner owned 9,600 of the 10,000 shares of common stock of Crossroads and all of the 750,000 shares of preferred stock of Crossroads.  The remaining 400 shares of the common stock were owned equally by Paula Dockery, Mavis Dockery, Carl Dockery, and Michele Jones.  On January 1, 1992, and January 1, 1993, petitioner gave the following number of shares of Crossroads' stock to his children:

| Donee | Date of gift | Common shares |
|-------|--------------|---------------|
| Carl Dockery | 1/1/92 | 448 |
| Michele Jones | 1/1/92 | 445 |
| Carl Dockery | 1/1/93 | 637 |
| Michele Jones | 1/1/93 | 637 |

These shares represented a minority interest in Crossroads.

H.   Gift Tax Returns and Notice of Deficiency

Based on a June 22, 1992, appraisal by KPMG Peat Marwick, petitioner reported on his 1992 and 1993 gift tax returns that the fair market value of Crossroads' stock was $303 per share on January 1, 1992, and January 1, 1993.  Petitioner paid gift tax of $16,749 for 1993.

Respondent determined that the fair market value of Crossroads' common stock was $704 per share on January 1, 1992, and $1,010 per share on January 1, 1993.

II.  OPINION

The sole issue for decision is the fair market value of Crossroads' stock that petitioner gave to his children on January 1, 1992, and January 1, 1993.

A.    Background

Section 2501 imposes a tax on gifts of property by an individual.  Gift tax is based on the fair market value of the property on the date of the gift.  Sec. 2512(a).  Fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts.  United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 25.2512-1, Gift Tax Regs.

The fair market value of stock is a question of fact.  Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347.  If selling prices for stock in a closely held corporation which is not listed on any exchange are not available, then we decide its fair market value by considering factors such as the company's net worth, earning power, dividend-paying capacity, management, goodwill, position in the industry, the economic outlook in its industry, and the values of publicly traded stock of comparable corporations.  See sec. 20.2031-2(f), Estate Tax Regs.

Petitioner has the burden of proving that respondent's determinations in the notice of deficiency are erroneous.[7]  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

---

[7] We need not decide whether to shift the burden of proof to respondent or modify it, as petitioner contends because we would reach the same result regardless of which party bears the burden of proof.

B.  **Fair Market Value of the Gifts From Petitioner to His Children**

    1.  **Expert Testimony**

Petitioner called an expert witness to give his opinion about the value of the gifts of Crossroads' stock petitioner made to his children in 1992 and 1993.  We may accept or reject expert testimony according to our own judgment, and we may be selective in deciding what parts of an expert's opinion, if any, we will accept.  Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990); Parker v. Commissioner, 86 T.C. 547, 562 (1986).

Respondent did not call an expert to testify.  Raymond T. Wise, Jr. (Wise), is an Internal Revenue Service (IRS) estate and gift tax attorney who appraised Crossroads' common stock in this case.  His appraisal is the basis for respondent's trial position.

The opinions of petitioner's and respondent's appraisers and the positions of the parties are as follows:

|  | Petitioner's returns | Petition/ petitioner's expert Gallagher | Deficiency notice and answer/Wise |
|---|---|---|---|
| Jan. 1, 1992, gift | $303 per share | 0 per share | $704 per share |
| Jan. 1, 1993, gift | 303 per share | $215 per share | 1,010 per share |

Crossroads' projected reserves made by Gallagher,

Crossroads' management, KPMG Peat Marwick, and respondent were as

follows:

| Crossroads' reserves as estimated by-- | As of 12/31/91 | As of 12/31/92 |
|---|---|---|
| KPMG Peat Marwick,[8] including losses for retroceded policies | $22,000,000 | $30,400,000 |
| Crossroads' reserves, net of losses for retroceded policies | 19,410,000 | 22,994,000 |
| Gallagher, net of losses for retroceded policies | 36,011,000 | 31,805,000 |
| Respondent, net of losses for retroceded policies | 13,587,000 | 16,095,800 |

### 2. KPMG Peat Marwick

KPMG Peat Marwick annually reviewed the reinsurance policies

and historical claims data for each of the self-insurer funds

reinsured by Crossroads to estimate the value of each fund for

each year. It used standard actuarial loss development methods

to estimate the size of Crossroads' reserves for 1991 and 1992.

On June 22, 1992, KPMG Peat Marwick appraised Crossroads'

common stock. The appraisal was based on the discounted present

value of the future dividend stream available to a U.S. owner of

its stock; KPMG Peat Marwick used a discount rate based on the

---

[8] KPMG Peat Marwick's reserve estimates reflect all claims liabilities and are gross of retroceded policies on the gift dates.

then-current market hurdle rate[9] for investments of comparable risk. KPMG Peat Marwick made various assumptions, including that Crossroads' reserves should be restated to reflect the gross reserve estimate (that is, the reserve estimate gross of retroceded policies) stated in KPMG Peat Marwick's 1991 review of reserve estimates. KPMG Peat Marwick estimated that Crossroads' stock was worth $505 per share, applied a 40-percent discount for minority interest and lack of marketability, and concluded that the fair market value of the Crossroads' common stock that petitioner gave to his children in 1992 and 1993 was $303 per share.

### 3. Petitioner's Trial Expert: Thomas Gallagher

Petitioner hired Thomas L. Gallagher (Gallagher), a property and casualty actuary with Tillinghast-Towers Perrin, to appraise Crossroads' common stock as of January 1, 1992, and January 1, 1993, in connection with the trial of this case. Gallagher has worked extensively in the workers' compensation industry.

Gallagher projected a reserve for each of the self-insurer funds reinsured by Crossroads. He reviewed the underlying claims data and extrapolated the historical results for the individual

---

[9] A hurdle rate is the minimum rate of return required by an investor for a proposed investment. Rosenberg, Dictionary of Banking and Financial Services 344 (2d ed. 1985).

funds.  He found that the average value of claims increased by 18.7 percent per year from 1981 to 1991.

Gallagher analyzed Crossroads' balance sheets as of December 31, 1991, and December 31, 1992.  He projected Crossroads' future distributable earnings from policies in effect on the gift dates by reviewing the policies' past results and analyzing Crossroads' loss reserves (embedded value).  He also projected distributable earnings from policies he expected Crossroads to write after the gift dates, based on a review of Crossroads' historical results and market expectations (goodwill value).

Gallagher assessed market conditions for Crossroads and its competitors.  He concluded that Crossroads had poor underwriting experience in most of the years since it began operations. Gallagher projected that Crossroads' premiums would grow by 5 percent per year for the 5 years after the gift dates, the loss ratio would be 160 percent for the first year and would decrease over the next 4 years, and that underwriting expenses would be 12.5 percent of earned premium for all 5 years.

He discounted the distributable earnings by 20 percent using risk-adjusted rates of return.  He estimated that Crossroads had understated its reserves by $16,600,000 on January 1, 1992, and by $8,800,000 on January 1, 1993.  Using these amounts for Crossroads' reserves, he estimated that the fair market value of

Crossroads' common stock was zero on January 1, 1992, and $3,312,000 ($331 per share) on January 1, 1993.

4.  Respondent's Appraiser:  Raymond Wise

Wise calculated the value of Crossroads' stock using two methods:  the book value method and the price/earnings method. He used Crossroads' assets and liabilities from its December 31, 1991, balance sheet as a starting point to estimate the book value.  He did not review any of the reinsurance policies or the underlying claims experience for the self-insurer funds.

Wise concluded that Crossroads' reserves for unpaid claims should be reduced by 30 percent based on his review of Crossroads' balance sheet and what he said was an industry standard requiring a 50-percent ratio between claims paid and reserves.  Thus, he multiplied Crossroads' unpaid claims by 70 percent and recorded the product on his adjusted balance sheet. He added the adjusted unpaid claims to Crossroads' other liabilities to get its total liabilities "corrected".  He subtracted total liabilities corrected from Crossroads' total assets, and projected that the book value of Crossroads' stock was $1,241 per share as of January 1, 1992, and $1,580 per share as of January 1, 1993.  Wise estimated the price/earnings value of Crossroads' stock using Rev. Rul. 59-60, 1959-1 C.B. 237 (which suggests using corporate financial statements for the 5-

year period before the date of each gift), and the formulas described in <u>Estate of Feldmar v. Commissioner</u>, T.C. Memo. 1988-429. He multiplied Crossroads' pretax weighted average income by a price/earnings capitalization rate of five to estimate the value for the stock. Wise calculated Crossroads' average claim paid to show whether it had enough reserves to pay its historical claims. He projected that the price/earnings value of Crossroads' stock (using weighted average earnings) was $978 per share as of January 1, 1992, and $1,537 per share as of January 1, 1993. He weighted the price/earnings method 60 percent and the book value method 40 percent to estimate the value of Crossroads' stock on the gift dates. He estimated that Crossroads' stock was worth $1,083 per share as of January 1, 1992, and $1,554 per share as of January 1, 1993. He then applied a 35-percent discount and estimated that the stock was worth $704 per share as of January 1, 1992, and $1,010 per share as of January 1, 1993.

C. <u>Analysis</u>

We accept KPMG Peat Marwick's reserve estimate and appraisal of Crossroads' common stock instead of those of Gallagher or Wise.

1. <u>KPMG Peat Marwick</u>

Respondent points out that Crossroads did not discount its 1991 and 1992 reserves for the time value of money, and contends

that KPMG Peat Marwick erred in not recommending that Crossroads discount its reserves for 1991 and 1992 for the time value of money as it had recommended that Crossroads do for 1989 and 1990.

We disagree that KPMG Peat Marwick should have considered the time value of money in estimating Crossroads' reserves. First, respondent points out that, as of December 31, 1995, and without considering the time value of money, KPMG Peat Marwick's estimate of Crossroads' reserves for 1991 and 1992 had been shown to be almost 100 percent accurate compared to Crossroads' known claim losses for those years. Second, Wise did not reduce Crossroads' reserves based on time value of money principles, nor did we reduce the reserves in Estate of Feldmar v. Commissioner, supra, to account for the time value of money. Third, respondent's contention that section 846 requires reinsurance companies to discount their unpaid losses (or reserves) to take into account the time value of money misses the mark. We are not computing Crossroads' reserve for unpaid losses for income tax purposes; we are valuing the stock of Crossroads.

Respondent used KPMG Peat Marwick's reserve estimates and valuation method as a benchmark to discredit Gallagher's report, and made no convincing argument that we should not adopt KPMG Peat Marwick's conclusion. We conclude that KPMG Peat Marwick's conclusions were reasonable.

We do not adopt Gallagher's and Wise's values for the following reasons.

   2.   <u>Gallagher</u>

Gallagher greatly overestimated Crossroads' reserves for 1992 and 1993 based on a calculation of reserves that was higher by 86 percent for 1992 and 38 percent for 1993 than Crossroads' balance sheet reserves.  He testified that his estimate of reserves was a major factor in his conclusion that Crossroads had negative economic value as of January 1, 1992, and a lower value as of January 1, 1993.  We believe his assumption that Crossroads would have a 160-percent loss ratio for the first year of future business based on Crossroads' experience loss ratios over the period 1982-91 did not give enough weight to the 2 years immediately before the gifts, during which Crossroads showed a strong trend towards decreasing loss ratios.  Also, Gallagher's assumed loss ratio of 160 percent is higher than the average loss ratio from 1982 to 1991 which was about 144 percent.  He testified that any closely held insurance company the size of Crossroads would experience or project a loss if it used an assumed loss ratio of 160 percent.  We conclude that, by using Gallagher's inflated reserves and loss ratios, Crossroads was predisposed to have a negative or lower value.  Gallagher's reserves and loss ratio assumptions skewed the projected values of Crossroads' stock to make it appear much less valuable than we

find that it was. The value of Crossroads' assets increased from about $4.6 million in 1987 to nearly $50 million in 1993, a tenfold increase. Crossroads' net income increased from about $430,000 in 1987 to $4.6 million in 1993, with an average net income of about $2.5 million from 1987 to 1993. We find Gallagher's assertion that Crossroads' stock was worthless as of January 1, 1992, to be unlikely in view of the fact that Crossroads was highly profitable and had not showed a loss since 1987.

3. <u>Wise</u>

Wise's appraisal was based on assumptions that we believe were inaccurate. Wise reduced Crossroads' reserves for unpaid losses by 30 percent. He said he based this on an industry standard, but he provided no source or other basis to justify this adjustment. Respondent argues that Wise's reduction of Crossroads' reserves was justified because Crossroads did not discount its reserves for the time value of money. We disagree. As discussed above at paragraph II-C-1, Wise did not reduce Crossroads' reserves for the time value of money. Thus, respondent's theory is a belated attempt to bolster Wise's arbitrary reduction of Crossroads' reserves.

Wise used the price/earnings and book value methods this Court used in <u>Estate of Feldmar v. Commissioner</u>, <u>supra</u>. However, Wise misapplied the price/earnings capitalization rate of five

used in Estate of Feldmar to convert Crossroads' weighted average earnings in that the Court in Estate of Feldmar applied the capitalization rate to posttax earnings and Wise applied it to pretax earnings. The corporation in Estate of Feldmar sold life insurance, individual and family accident and health insurance, vehicle warranty/service contracts, and collateral protection services; Crossroads sells only workers' compensation reinsurance. Unlike life insurance, workers' compensation reinsurance is long-tail insurance because of the length of time before a reinsurer's obligations mature. See S. Rept. 99-313, at 502 (1986), 1986-3 C.B. (Vol. 3) 502. This makes the size of the reinsurer's reserve much more important because the reinsurer's liability can extend for longer periods. Id.

D. Discount

Petitioner argues that we should apply a 35-percent discount for minority interest and lack of marketability to Gallagher's estimate of the value of Crossroads' stock (zero for January 1, 1992 and $331 per share for January 1, 1993), and thus contends that the stock was worth zero on January 1, 1992, and $215 per share on January 1, 1993.

Respondent agrees that petitioner is entitled to lack of marketability and minority interest discounts. Respondent applied a 35-percent discount to the fair market value of

Crossroads' common stock on the gift dates in the notice of deficiency.

KPMG Peat Marwick applied a 40-percent discount. Because we found KPMG Peat Marwick's appraisal of Crossroads' stock reliable, we adopt KPMG Peat Marwick's contention that a 40-percent discount should be applied to value the Crossroads' stock petitioner gave to his children in 1992 and 1993.

E.  Conclusion

We conclude that the fair market value per share of the stock of Crossroads that petitioner gave to his children was $303 per share on January 1, 1992, and $303 per share on January 1, 1993.

Decision will be entered that there are no deficiencies due from petitioner, and there is no overpayment due to petitioner.