## ATLANTIC MUTUAL INSURANCE CO. *v.* COMMISSIONER OF INTERNAL REVENUE

No. 97–147. Argued March 2, 1998—Decided April 21, 1998

SCALIA, J., delivered the opinion for a unanimous Court.

*George R. Abramowitz* argued the cause for petitioner. With him on the briefs were *Dennis L. Allen, M. Kristan Rizzolo, John S. Breckinridge, Jr.,* and *James H. Kenworthy.*

*Kent L. Jones* argued the cause for respondent. With him on the brief were *Solicitor General Waxman, Assistant Attorney General Argrett, Deputy Solicitor General Wallace, David I. Pincus,* and *Edward T. Perelmuter.*[*]

JUSTICE SCALIA delivered the opinion of the Court.

Property and casualty insurance companies maintain accounting reserves for "unpaid losses." Under the Tax Reform Act of 1986, increases in loss reserves that constitute "reserve strengthening" do not qualify for a certain one-time tax benefit. We must decide whether the term "reserve strengthening" reasonably encompasses any increase in re-

---

[*]Briefs of *amici curiae* urging reversal were filed for Ambase Corp. by *Peter H. Winslow* and *Gregory K. Oyler;* and for the American Insurance Association et al. by *Matthew J. Zinn, J. Walker Johnson, Craig A. Berrington, Allan J. Stein,* and *Steven C. Elliott.*

serves, or only increases that result from changes in the methods or assumptions used to compute them.

## I

Atlantic Mutual Insurance Co. is the common parent of an affiliated group of corporations, including Centennial Insurance Co., a property and casualty (PC) insurer. From 1985 to 1993, the two corporations (Atlantic) maintained what insurers call "loss reserves." Loss reserves are estimates of amounts insurers will have to pay for losses that have been reported but not yet paid, for losses that have been incurred but not yet reported, and for administrative costs of resolving claims.

Before enactment of the Tax Reform Act of 1986, Pub. L. 99–514, 100 Stat. 2085, the Internal Revenue Code gave PC insurers a full deduction for loss reserves as "losses incurred." In each taxable year, not only losses paid, but the full amount of the loss reserves, reduced by the amount of the loss reserves claimed for the prior taxable year, would be treated as a business expense. 26 U. S. C. §§ 832(b)(5) and (c)(4) (1982 ed.). This designation enabled the PC insurer to take, in effect, a current deduction for future loss payments without adjusting for the "time value of money"— the fact that " '[a] dollar today is worth more than a dollar tomorrow,' " D. Herwitz & M. Barrett, Accounting for Lawyers 221 (2d ed. 1997). Section 1023 of the 1986 Act amended the Code to require PC insurers, for taxable years beginning after December 31, 1986, to discount unpaid losses to present value when claiming them as a deduction. 100 Stat. 2399, 2404, 26 U. S. C. §§ 832(b)(5)(A), 846 (1982 ed., Supp. V). Absent a transitional rule, PC insurers would have been left to subtract undiscounted year-end 1986 reserves from discounted year-end 1987 reserves for purposes of computing losses incurred for taxable year 1987—producing artificially low deductions. The 1986 Act softened this consequence by requiring PC insurers, for purposes of that

1987 tax computation, to discount 1986 reserves as well. 100 Stat. 2404, note following 26 U. S. C. § 846.

Because the requirement that PC insurers discount 1986 reserves changed the "method of accounting" for computing taxable income, PC insurers, absent another transitional rule, would have been required to recognize as income the difference between undiscounted and discounted year-end 1986 loss reserves. See 26 U. S. C. § 481(a) (1988 ed.). To avoid this consequence, § 1023(e)(3)(A) of the 1986 Act afforded PC insurers a "fresh start," to wit, an exclusion from taxable income of the difference between undiscounted and discounted year-end 1986 loss reserves. 100 Stat. 2404, note following 26 U. S. C. § 846. Of course the greater the 1986 reserves, the greater the exclusion. Section 1023(e)(3)(B) of the 1986 Act foreclosed the possibility that insurers would inflate reserves to manipulate the "fresh start" by excepting "reserve strengthening" from the exclusion:

> "(B) RESERVE STRENGTHENING IN YEARS AFTER 1985.—Subparagraph (A) [the fresh-start provision] shall not apply to any reserve strengthening in a taxable year beginning in 1986, and such strengthening shall be treated as occurring in the taxpayer's 1st taxable year beginning after December 31, 1986." 100 Stat. 2404, note following 26 U. S. C. § 846.

Regulations promulgated by the Treasury Department set forth rules for determining the amount of "reserve strengthening":

> "(1) *In general.* The amount of reserve strengthening (weakening) is the amount that is determined under paragraph (c)(2) or (3) to have been added to (subtracted from) an unpaid loss reserve in a taxable year beginning in 1986. For purposes of section 1023(e)(3)(B) of the 1986 Act, the amount of reserve strengthening (weakening) must be determined separately for each unpaid loss

reserve by applying the rules of this paragraph (c). This determination is made without regard to the reasonableness of the amount of the unpaid loss reserve and without regard to the taxpayer's discretion, or lack thereof, in establishing the amount of the unpaid loss reserve. . . .

. . . . .

"(3) *Accident years before 1986*—(i) *In general.* For each taxable year beginning in 1986, the amount of reserve strengthening (weakening) for an unpaid loss reserve for an accident year before 1986 is the amount by which the reserve at the end of that taxable year exceeds (is less than)—

"(A) The reserve at the end of the immediately preceding taxable year; reduced by

"(B) Claims paid and loss adjustment expenses paid ("loss payments") in the taxable year beginning in 1986 with respect to losses that are attributable to the reserve. . . ." Treas. Reg. § 1.846–3(c), 26 CFR § 1.846–3(c) (1997).

In short, any net additions to reserves (with two exceptions not here at issue, § 1.846–3(c)(3)(ii)) constitute "reserve strengthening" under the regulation.

The Commissioner of Internal Revenue determined that Atlantic made net additions to reserves—"reserve strengthening"—during 1986, reducing the "fresh start" entitlement by an amount that resulted in a tax deficiency of $519,987. The Tax Court disagreed, holding that Atlantic had not strengthened its reserves. "Reserve strengthening," the Tax Court held, refers only to increases in reserves that result from changes in the methods or assumptions used to compute them. (Atlantic's reserve increases, there is no dispute, did not result from any such change.) The United States Court of Appeals for the Third Circuit reversed the Tax Court, concluding that the Treasury Regulation's defini-

tion of "reserve strengthening" to include any net additions to reserves is based on a permissible construction of the statute. 111 F. 3d 1056 (1997). (It expressly disagreed with the Eighth Circuit's conclusion in *Western National Mutual Insurance Co.* v. *Commissioner*, 65 F. 3d 90 (1995), that the Treasury Regulation is invalid.) We granted certiorari. 522 U. S. 931 (1997).

## II

The 1986 Act does not define "reserve strengthening." Atlantic contends that the term has a plain meaning under the statute: reserve increases attributable to changes in methods or assumptions. If that is what the term plainly means, Atlantic must prevail, "for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–843 (1984).

Atlantic contends that the plain meaning of "reserve strengthening" can be discerned, first, from its use in the PC insurance industry. It presented at trial two expert reports which, by "constructing a working definition of the term" that requires "a material change in methodology and/or assumptions," App. 68, 74, purport to demonstrate that Atlantic "did not strengthen reserves," *id.,* at 99. Our task, of course, is to determine not what the term *ought* to mean, but what it *does* mean. Atlantic's first expert, before "constructing" a definition, expressly acknowledged that "reserve strengthening" is "not a well-defined PC insurance or actuarial term of art to be found in PC actuarial, accounting, or insurance regulatory literature." *Id.,* at 60. On this point she was in agreement with the Commissioner's experts: "In the property-casualty industry the term 'reserve strengthening' has various meanings, rather than a single universal meaning," *id.,* at 124. If the expert reports establish anything, it is that "reserve strengthening" does not have an established meaning in the PC insurance industry.

Atlantic next contends that a plain meaning can be discerned from prior use of the term in life insurance tax legislation. According to Atlantic, the term has its roots in the Life Insurance Company Income Tax Act of 1959, which provided tax consequences for changes in the "basis" for determining life insurance reserves. 73 Stat. 125, 26 U. S. C. § 810(d) (1958 ed., Supp. I). But that provision does not define, or for that matter even use, the term "reserve strengthening." Though the regulation that implemented the provision uses the term "reserve strengthening" in a caption, Treas. Reg. § 1.810–3(a), 26 CFR § 1.810–3(a) (1997), its text does not mention the term, and one of its Examples speaks only of "reserve strengthening attributable to the change in basis which occurred in 1959," § 1.810–3(b), Ex. 2. If, as Atlantic argues, "basis" and "assumptions or methodologies" are interchangeable terms, Brief for Petitioner 17, n. 8, and a change in basis is necessary for "reserve strengthening," it is redundant to say "reserve strengthening attributable to the change in basis which occurred in 1959," much as it would be to say "a sunburn attributable to the sun in 1959." On Atlantic's assumptions, the more natural formulation would have been simply "reserve strengthening in 1959." Thus, the 1959 Act and implementing regulation suggest, if anything, that a change in basis is a sufficient, but not a necessary, condition for "reserve strengthening."

Atlantic further contends that the term "reserve strengthening" draws a plain meaning from a provision of the Tax Reform Act of 1984 that accorded a "fresh start" adjustment to life insurance reserves. Div. A, 98 Stat. 758, note following 26 U. S. C. § 801 (1984 Act). That provision, like the "fresh start" adjustment for PC insurers in the 1986 Act, said that the "fresh start" would not apply to reserve strengthening, specifically, "to any reserve strengthening reported for Federal income tax purposes after September 27, 1983, for a taxable year ending before January 1, 1984." 98

Stat. 759. Unlike the 1986 Act, however, the 1984 Act expressly provided that "reserve strengthening" would not be excluded from the "fresh start" if the insurer "employs the reserve practice used for purposes of the most recent annual statement filed before September 27, 1983 . . . ." *Ibid.* If, as Atlantic contends, reserve strengthening encompasses only reserve increases that result from a change in reserve practices (viz., change in methods or assumptions), the saving clause is superfluous. Thus, to the extent the definition of "reserve strengthening" in the life insurance context is relevant to its meaning here (which is questionable, see 111 F. 3d, at 1061–1062), the 1984 Act, like the regulations under the 1959 Act, tends to contradict, rather than support, petitioner's interpretation. We conclude that neither prior legislation nor industry use establishes the plain meaning Atlantic ascribes to "reserve strengthening."

## III

Since the term "reserve strengthening" is ambiguous, the task that confronts us is to decide, not whether the Treasury Regulation represents the best interpretation of the statute, but whether it represents a reasonable one. See *Cottage Savings Assn.* v. *Commissioner*, 499 U. S. 554, 560–561 (1991). We conclude that it does.

As a purely linguistic matter, the phrase is certainly broad enough to embrace *all* increases in (*all* "strengthening of") the amount of the reserve, for whatever reason and from whatever source. Atlantic contends that this interpretation is unreasonable because, in theory, it produces absurd results, as the following example supposedly illustrates: Assume that in 1985 a PC insurer had four case reserves of $500 each (total reserves of $2,000). If two cases settled in 1986 for $750 each ($1,500 total), the remaining loss reserve would be $1,000. Under the regulation, according to Atlantic, the Commissioner would find "reserve strengthening" of

$500 (1986 loss reserves ($1,000) less (first year reserves ($2,000) less second year payments ($1,500))), even though reserves did not increase. The Commissioner denies this consequence, contending that under the stipulation in this case the increase in the reserve would be "reduced to zero" by an offsetting adjustment when the payment is made, and that adjustments in the IBNR reserve (reserve for claims "incurred but not reported") may result from payments in excess of prior reserve amounts, offsetting changes in other reserves. Brief for Respondent 36–39.

We need not resolve that dispute, because we agree with the Commissioner that Atlantic's horrific example is in any event unrealistic. The property and casualty insurer that had only four cases would not be in business very long, with or without the benefit of the tax adjustment—or if he would, his talents could be put to better use in Las Vegas. The whole point of the insurance business is to spread the insured risk over a large number of cases, where experience and the law of probabilities can be relied upon. And where hundreds (or more likely thousands) of claims are involved, claims resolved for less than estimated reserves will tend to offset claims that settle for more than estimated reserves. See Notice of Proposed Rulemaking Discounted Unpaid Losses, FI–139–86, 1991–2 Cum. Bull. 946, 947 ("For most unpaid loss reserves . . . any potential inaccuracies are likely to offset each other in the aggregate"). There may, to be sure, be some discrepancy in one direction or the other, but it would not approach the relative proportions claimed by Atlantic.

It should be borne in mind that the provision at issue here is a limitation upon an extraordinary deduction accorded to PC insurers. There was certainly no need for that deduction to be microscopically fair, and the interpretation adopted by the Treasury Regulation seems to us a reasonable accommodation—and one that the statute very likely

intended—of the competing interests of fairness, administrability, and avoidance of abuse.

\* \* \*

Because the Treasury Regulation represents a reasonable interpretation of the term "reserve strengthening," we affirm the judgment of the Court of Appeals.

*It is so ordered.*