[ PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
1/21/99
THOMAS  K. KAHN
CLERK

No. 98-8005

U.S. Tax Court No. 7779-95

ALUMAX INC. AND CONSOLIDATED SUBSIDIARIES,

Petitioners-Appellants,

versus

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

Appeal from a Decision of the
United States Tax Court

(January 21, 1999)

Before COX, CARNES and HULL, Circuit Judges.

COX, Circuit Judge:

Alumax Inc. appeals a tax court decision concluding that Alumax owes about $129,000,000 in taxes for the years 1981-86. The tax court's decision rested on its ruling that for the years 1984-86 Alumax could not join the consolidated return of one of its shareholders, AMAX Inc., under Internal Revenue Code §§ 1501 and 1504(a). We affirm.

I. *Background*

No one challenges the tax court's findings of fact, and it is on those that we rely. Alumax is a Delaware corporation and Atlanta-based manufacturer of aluminum products. Since 1974, Alumax's voting stock has belonged to Amax and to a changing group of Japanese interests that has included at various times Mitsui & Co., Ltd., and Nippon Steel Corporation. From 1974 until 1984, Amax and the Japanese interests shared power equally: in shareholder matters, board election, and board voting, each controlled 50% of the votes. Amax and the Japanese interests also shared dividends equally.

At the beginning of 1984, however, Alumax underwent a significant restructuring. First, shareholder votes were redistributed. While Alumax and the Japanese interests continued to hold equal numbers of common shares, Amax held stock of a class that had four votes per share while the Japanese-interest stock belonged to a class with only one vote per share. Amax thus had a four-to-one advantage over the Japanese interests in most shareholder matters. But Amax's voting power had its limits. A majority of each *class* of stock had to approve any action touching any of the following six matters:

- any merger;
- purchase or sale of any asset worth at least 5% of Alumax's net worth (about $36 million between 1984 and 1986);
- partial or complete liquidation or dissolution of Alumax;
- capital appropriation or asset disposition worth more than $30 million (about 1.8% of Alumax's total assets);

2

- election or dismissal of Alumax's chief executive officer; and
- loans to affiliated corporations not in the ordinary course of business.

Amax's voting advantage did, however, extend to the election of Alumax's board of directors: the Amax shares were entitled to elect four of the board's six voting members, while the Japanese interests could select only two. The Amax-elected directors each held two votes, moreover, while the Japanese-interest directors had only one each.[1] While this arrangement gave the Amax-elected directors 80% voting power over most matters, the Amax-elected directors suffered the same limitations on their powers as Amax did as a shareholder: in the same six matters listed above, any action had to be approved by a majority of the Amax-elected directors *and* a majority of the Japanese-interest directors.

There was yet another restriction on the Amax directors' authority. If any Japanese-interest director objected to a board action, and that objection was ratified within fourteen days by the Japanese corporation, then the Alumax board vote would become ineffective. Amax had an out: upon notice within five days, Amax could challenge the "veto," and the vote would become effective if Amax persuaded a panel of arbitrators (who had fourteen days to rule) that the vote would not have a material and adverse effect on the Japanese interests' investment. On the other hand, if Amax challenged the "veto," but lost before the panel of arbitrators, the vote would remain ineffective.[2] In that situation, furthermore, the Japanese interests could buy all or part of Amax's Alumax stock at a discount.[3]

---

[1] The directors selected one nonvoting director, necessarily an Alumax employee, and Alumax's chief executive officer served ex officio as another nonvoting member.

[2] An analogous "veto" provision applied to shareholder votes as well.

[3] This call provision was subject to Amax's right to convert its shares into shares of another class that, unlike the shares Amax owned, had only one vote. The conversion would

3

Besides these limitations on the voting authority of the Amax-elected directors, Alumax's board itself suffered a significant limitation on its traditional authority. Absent contrary provision in corporate documents, under Delaware law the board of directors determines when and in what amount distributions will be made, subject to priorities awarded to certain classes of stock. *See, e.g.*, Del. Code Ann. tit. 8, § 170; *see also* Model Business Corp. Act § 6.40(a); 11 Timothy P. Bjur & James Solheim, *Fletcher Cyclopedia of the Law of Private Corporations* § 5320, at 633 (perm. ed. 1995). Alumax's certificate of incorporation, however, *required* Alumax to pay dividends amounting to 35% of its net income. Those dividends were not divided equally: the Japanese interests received 80%, Amax only 20%.

During the tax years 1984 through 1986, Alumax was included on Amax's consolidated tax return. This consolidation yielded a tax benefit to Alumax, which was able to offset its profits with losses from other Amax subsidiaries and to carry back general business credits to previous years. The Internal Revenue Service determined that consolidation was not allowed for the years 1984-86 under I.R.C. §§ 1501 and 1504(a) because Amax did not have 80% of the voting power in Alumax. Alumax challenged this determination in tax court, lost, and now appeals, arguing that it is entitled to join the consolidated return of Amax's family of corporations. Because the issue presented is solely one of law, our review is de novo. *See Blohm v. Commissioner*, 994 F.2d 1542, 1548 (11th Cir. 1993).

## II. *Discussion*

Under I.R.C. § 1501, corporations belonging to an "affiliated group" may file a consolidated

---

preserve Amax's interest in Alumax, therefore, but deprive Amax of its supermajority voting power.

return. In 1984 (the relevant year for our purposes), I.R.C. § 1504(a)(2) defined "affiliated group" to mean a member of a chain of corporations in which a parent "owns directly stock possessing at least 80 percent of the voting power of all classes of stock." Congress amended § 1504(a) in 1984 to create a two-pronged test for "affiliated group": loosely stated, a subsidiary may now join the return of a parent that holds both 80% of the voting power in the subsidiary and 80% of the subsidiary's stock, measured by value. Deficit Reduction Act of 1984 § 60(a), Pub. L. No. 98-369, § 60(a), 98 Stat. 494, 577-79. This amendment contained a grandfather clause, however, that extended the pre-1984 test through 1988 for all corporations that met the old test on June 22, 1984. *See id.* § 60(b)(2). Alumax completed its 1984 restructuring before that date. Hence, if the restructured Alumax was entitled to join the consolidated return under the pre-1984 standard, it was entitled to do so through 1986. Because Alumax's right to consolidation thus turns simply on whether Amax held 80% of the voting power in Alumax, the central question is what 80% voting power means.

According to Alumax, 80% voting power is a bright line: it means nothing but the power to elect directors who hold 80% of the total board votes. Alumax accordingly argues that the power of the Amax-elected directors, or of the board itself, to manage corporate affairs is irrelevant. The IRS, on the other hand, rejects this mechanical test and argues that 80% voting power must mean not only the power to elect a certain percentage of the board votes, but also the actual power to run the corporation that would normally accompany control of such a supermajority of the board.

This is a question of statutory construction. The statute's language would control, of course, if it were plain. *See Atlantic Mut. Ins. Co. v. Commissioner*, 523 U.S. 382, 118 S. Ct. 1413, 1417 (1998). But it is not: the naked phrase "80 percent of the voting power" does not answer the

5

question "Power to do what?" We do not, moreover, have the benefit of on-point Treasury regulations that, if reasonable, would control. *See id.* at 1418. The analysis must therefore rely on extrinsic sources of congressional intent. *See, e.g.*, *O'Gilvie v. United States*, 66 F.3d 1550, 1558 (10th Cir. 1995), *aff'd*, 519 U.S. 79, 117 S. Ct. 452 (1996).

The parties here agree that § 1504's history tells all. Section 1504 is merely the most recent in a series of statutes, dating back to the 1920s, that define affiliation for purposes of the consolidated return privilege. Each of these statutes has relied on voting power in some way to determine affiliation. *See* Revenue Act of 1924 § 240(c), Pub. L. No. 68-176, § 240(c), 43 Stat. 253, 288; Revenue Act of 1926 § 240(d), Pub. L. No. 69-20, § 240(d), 44 Stat. 9, 46; Revenue Act of 1928 §§ 141(d), 142(c), Pub. L. No. 70-562, §§ 141(d), 142(c), 45 Stat. 791, 831-32. Beginning in the 1930s, the courts and the IRS have refined the raw statutory language by delineating what it means to have a certain level of voting power. In amendments to the statute since the 1930s, Congress has not disturbed this refinement in any way relevant here. *See* Revenue Act of 1942 § 159(a), Pub. L. No. 77-753, § 159(a), 56 Stat. 798, 859; Internal Revenue Code of 1954 § 1504(a), Pub. L. No. 83-591, § 1504(a), 68A Stat. 3, 369-70. Thus, the parties seem to agree, Congress's acquiescence has imbued this judicial and agency interpretation with the significance of congressional intent. *Cf. United States v. Leslie Salt Co.*, 350 U.S. 383, 389-95, 76 S. Ct. 416, 420-23 (1956) (applying analogous historical analysis to another tax statute).

This historical judicial and IRS interpretation is that "voting power" means the power to control the corporation's business through the election of the board of directors. *See, e.g.*, *Erie Lighting Co. v. Commissioner*, 93 F.2d 883, 885 (1st Cir. 1937); Rev. Rul. 69-126, 1969-1 C.B. 218, 218 ("[P]articipation in the management of the subsidiary through election of the board of directors

6

is the criterion of the voting power in this case . . . ."); I.T. 3896, 1948-1 C.B. 72, 75 (same). This interpretation is rooted in the reason behind the privilege of consolidation: § 1501 was "based upon the principle of levying the tax according to the true net income and invested capital of a single business enterprise, even though the business is operated through more than one corporation." *Atlantic City Elec. Co. v. Commissioner*, 288 U.S. 152, 154, 53 S. Ct. 383, 384 (1933) (quoting Treas. Reg. no. 45, art. 631); *see Erie Lighting*, 93 F.2d at 884-85. A single enterprise exists by virtue of common control of business affairs. *See id.* at 886. Thus, the relevant voting power is the power to run the corporation's business — through the board of directors. *See id.* at 885.

There are two implicit assumptions that carry analyses like *Erie Lighting*'s from §§ 1501 and 1504's first principles (common control = common enterprise) to the election-of-directors rule. Those assumptions — which are completely sound as a matter of default state corporate law — are: (1) that the directors manage a corporation's business; and (2) that a supermajority of directors controls the board. *See, e.g.*, *Erie Lighting* at 886; *see also* Del.Code Ann. tit. 8, § 141(a) ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation."); *id.* § 141(b) ("The vote of the majority of the directors present at a meeting at which a quorum is present shall be the act of the board of directors [unless otherwise provided]."); 2 Victoria A. Braucher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 505 (perm. ed. 1998) (describing board's broad powers). These assumptions make it natural in most cases to equate the power to elect 80% of the board with the power to operate the subsidiary as part of a common enterprise.

But when these assumptions are belied – as here – there is no longer any reason for equating

the power to elect directors with control, and hence to assume that the parent and subsidiary operate as a single enterprise. Consider, for example, a two-shareholder corporation whose board may act only by unanimous vote; the power to elect 80% of that board is equivalent to the power to elect 50% of a "normal" board. Or consider the corporation that gives its board only the power to recommend courses of action to the officers; power to elect 80% of that board is not per se the power to manage the corporation's business. Thus, it is unjustified in such circumstances to make the step from the purpose of § 1501 (to permit single enterprises to file one return) to a rule defining 80% voting power to mean exclusively the power to elect 80% of the directors. Rather, the principle laid down in cases like *Erie Lighting*, and implicitly espoused by Congress, requires taking into account not only the power to elect 80% of the votes on the board of directors, but also the extent to which those directors, and the board itself, have the authority to manage the corporation's business.

Here, the tax court properly concluded that the voting authority of the Amax-elected Alumax directors was too diluted, and the power of Alumax's board itself too restricted, for Amax to reach the 80% voting power threshold. It is obvious from the Delaware statute cited above that mandatory dividends robbed the Alumax board of some customary discretion. But more significantly, the measures eliminating the Amax-elected directors' supermajority voting power in certain situations reduced Amax's control over Alumax even further. The Japanese interests retained the unusual and impressive power to delay the effectiveness of any board action by at least 28 days and to force Alumax to persuade a panel of arbitrators that the action did not have a material and adverse effect on the Japanese interests' stock. Because of the cumbersomeness of the procedure prescribed for overcoming the Japanese interests' objection, the Japanese interests in essence held a right to veto

8

that reached to important matters.[4]

On the six matters in which the directors voted by class, moreover, the Amax-elected directors' voting power effectively declined to 50%. Many of these matters lie at the core of the board's authority to run a corporation's business. Selection of a chief executive officer, for instance, is one of the board's "basic management functions." 2 Braucher et al., *Fletcher Cyclopedia* § 505, at 550. Purchases and dispositions of assets (unless they involve "substantially all" of the corporation's assets, *see* Del. Code Ann. tit. 8, § 271(a)) also fall within the board's oversight and have obvious importance to the operation of a manufacturing business.

All in all, these restrictions on both the power of Alumax's board and that of the Amax-elected directors prevented Amax from operating Alumax as part of Amax's single enterprise, notwithstanding Amax's facial power to control 80% of the board votes. In §§ 1501 and 1504, Congress extended the consolidation privilege to single enterprises, identified by a shorthand test. Applying the test mechanically here would thwart Congress's intent to give the privilege only to single enterprises. We hold, therefore, that Amax did not have 80% of the voting power in Alumax under § 1504(a), and that Alumax was not entitled to join Amax's consolidated return.

### III. *Conclusion*

For the foregoing reasons, we affirm the tax court's decision.

AFFIRMED.

---

[4] The "veto" provision may have had other, less detectable or provable effects, as well. Whether or not exercised, this power would necessarily color many votes, discouraging any Amax-elected director from voting in the interests of the Amax family as a single enterprise if the Japanese interests were opposed. For the sake of effective management, the director would tend to vote, rather, in the interests of Alumax as it historically was — a corporation held 50-50 by two independent interests.