# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-2572

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Arkansas. |
| Jim Guy Tucker, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: January 13, 2000

Filed: July 3, 2000

_____

Before BOWMAN, FAGG, and LOKEN, Circuit Judges.

_____

LOKEN, Circuit Judge.

Former Arkansas Governor Jim Guy Tucker pleaded guilty to conspiracy to defraud the United States by impeding the assessment and collection of income tax in violation of 18 U.S.C. § 371. The plea agreement provided that Tucker's sentence would include a term of probation, a fine, and the payment of restitution based on Tucker's share of "the loss sustained by the United States as a result of the offense." The presentence investigation report (PSR) asserted that the illegal scheme resulted in a tax loss to the government of $3,562,257. Tucker objected to that determination, claiming "there is no tax loss."

At the evidentiary sentencing hearing, the government introduced *no* evidence as to tax loss, relying instead upon the PSR and the prosecutor's cross examination of Tucker's witnesses. We have held in numerous cases that the PSR is not evidence, and the government has the burden at sentencing to prove fact-intensive issues such as tax loss by a preponderance of the evidence. See, e.g., United States v. Ramirez, 196 F.3d 895, 898-99 (8th Cir. 1999); United States v. Shoff, 151 F.3d 889, 892-93 (8th Cir. 1998); United States v. Hudson, 129 F.3d 994, 994-95 (8th Cir. 1997). These rules clearly apply to restitution sentencing issues under the statute in effect at the time of Tucker's offense. See 18 U.S.C. § 3664(d) (1985). The restitution issue in this case involves complex questions of tax law and enforcement policy. We conclude the government's failure to satisfy its evidentiary burden requires us to reverse the district court's $1 million restitution order and to remand the case for resentencing.

## I. The Scheme.

We will briefly describe the complex transactions at issue, based upon fact statements in the PSR to which Tucker did not object, plus the sentencing hearing testimony of his long-time accountant. In 1987, Tucker and William Marks undertook a joint venture in the cable television business, agreeing to divide their profits equally. At the time, Marks owned 18% of Planned Cable Systems (PCS), a subchapter C corporation that owned several cable television systems. Tucker owned 100% of Cable Management Inc. (CMI), an Arkansas corporation that had elected subchapter S status in May 1985.[1] In June 1987, Marks and Tucker acquired the remaining shares of PCS from a third party for $6,000,000 and merged PCS into CMI, with Marks acquiring a 50% interest in CMI from Tucker.

---

[1]Briefly stated, under the Internal Revenue Code, most incorporated businesses are subchapter C corporations, meaning that their activities are taxed at the corporate level. A subchapter S corporation is a qualified corporation that elects to have its business activities taxed only at the shareholder level. See 26 U.S.C. §§ 1361-1379.

One of PCS's businesses was Plantation Cable System, a Florida cable operator. In August 1997, an unrelated third party agreed to purchase Plantation's assets from CMI for $15 million. When advised that this transaction would realize substantial taxable gain, Tucker, Marks, and a tax attorney devised a series of sham transactions to minimize their tax liability. They reversed the PCS-CMI merger and transferred the PCS assets into LMS, falsely representing that Tucker's only interest in that corporation was as a substantial secured creditor. They then put LMS into bankruptcy. Aided by further misrepresentations to the bankruptcy court, they had the Plantation assets transferred to Tucker in exchange for his secured debt. In January 1988, Tucker sold the Plantation assets to the unrelated buyer for $14.75 million. Tucker received $11.75 million of the purchase price, and Marks received $3 million in the form of non-compete payments. In his 1988 individual tax return filed in early 1989, Tucker claimed a stepped-up basis in the Plantation assets and paid tax on a reported capital gain of $4,466,977. CMI paid no corporate-level capital gains tax on the sale of the Plantation assets.

## II.  The Restitution Issue on Appeal.

When Tucker committed his conspiracy offense, the Victim and Witness Protection Act gave sentencing courts discretion to order a defendant to pay restitution to crime victims, taking into account "the amount of loss sustained by any victim as a result of the offense" and the defendant's financial resources and ability to pay. 18 U.S.C. § 3664(a) (1985). Tucker concedes that his conspiracy offense is subject to that Act and that a government agency such as the IRS may qualify as a crime victim. See United States v. Minneman, 143 F.3d 274, 284 (7th Cir. 1998), cert. denied sub nom. Punke v. United States, 526 U.S. 1006 (1999). Of course, any amounts paid to the IRS as restitution must be deducted from any civil judgment IRS obtains to collect the same tax deficiency. See United States v. Helmsley, 941 F.2d 71, 102 (2d Cir. 1991), cert. denied, 502 U.S. 1091 (1992).

The issue here is "the amount of loss sustained by" the IRS. Because the government offered no evidence at sentencing, we do not know how the IRS calculated this loss. We only know how the probation officer calculated the loss in preparing the PSR. The PSR focused on the conspirators' reversal of the PCS-CMI merger, the step that eliminated any corporate level tax CMI would have owed had it sold the Plantation assets. To reconstruct the tax loss, the PSR ignored this reversal as fraudulent, treating CMI as having sold the assets. Though CMI is an S corporation, normally free of corporate-level taxation, § 1374 of the 1954 Code contained an exception to this principle for S corporations with substantial net long term capital gains.[2] Using the carry-over basis in the Plantation assets that CMI inherited from PCS when those two companies merged, and using § 1374 to calculate the corporate-level tax that CMI would have paid on the substantial capital gain realized on the sale of those assets, the PSR determined the tax loss to be over $3.5 million.

The problem arises because, before the transactions in question, § 1374 was significantly amended by the Tax Reform Act of 1986 (TRA), which was further retroactively amended by the Technical and Miscellaneous Revenue Act of 1988 (TAMRA).[3] These amendments were revenue-enhancing to the government in most situations, but Tucker presented detailed evidence at the sentencing hearing tending to show that application of the new § 1374 to CMI's hypothetical sale of the Plantation assets would reduce Tucker's share of the actual tax loss to substantially less than $1 million. The government argued, and the district court agreed at the conclusion of the sentencing hearing, that amended § 1374 did not apply. Therefore, the court

[2]Section 1374 was initially added to the Code in 1966 as § 1378. See Act of April 14, 1966, Pub. L. No. 89-389, § 2, 80 Stat. 111, 113 (1966).

[3]See Tax Reform Act of 1986, Pub. L. No. 99-514, §§ 632-633, 100 Stat. 2085, 2275-77 (1986); Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, §§ 1006(f) & (g), 1019(a), 102 Stat. 3342, 3403-10, 3593 (1988).

determined that the tax loss was at least $2.9 million and ordered Tucker to pay $1 million in restitution (the same amount the court ordered co-defendant Marks to pay).

On appeal, Tucker argues the district court should have applied amended § 1374 and therefore the restitution order must be reversed. The government argues that old § 1374 applies, that the PSR calculated Tucker's share of the tax loss under old § 1374 as substantially more than $1 million, and that Tucker's accountant witness confirmed the accuracy of this calculation. Therefore, the district court did not abuse its discretion in ordering restitution of $1 million. See United States v. French, 46 F.3d 710, 716 (8th Cir. 1994) (standard of review).

### III. Two Preliminary Issues.

Before we take up the difficult question of which § 1374 should apply, we must consider the government's alternative contention that the issue is irrelevant for two reasons. First, the government persuaded the district court that it should apply old § 1374 because it was "the tax law which created the tax liability which the Defendants sought to avoid by their fraud." We disagree. The restitution statute directs the sentencing court to consider "the loss sustained" by a victim. 18 U.S.C. § 3664(a) (1985). Thus, the inquiry is actual loss; intended loss is irrelevant. See United States v. Messner, 107 F.3d 1448, 1455 (10th Cir. 1997). Actual loss to the IRS must be calculated based upon the tax laws that apply to the transaction in question.

Second, the restitution statute permits a sentencing court to base restitution on the value of lost property either on the date of the loss, or on the date of sentencing. The government argues that the tax loss began when the conspiracy started in June 1987, long before the enactment of TAMRA's retroactive amendments to § 1374 as amended by TRA. This argument is without merit for many reasons. To state its most obvious flaw, the actual loss to this victim, the IRS, occurred when taxes should have

-5-

been paid on the gain from the sale of Plantation assets in January 1988. Leaving aside the complexities of estimated tax liability, the loss occurred when 1988 taxes were due and owing in early 1989. By then, both TAMRA and TRA were in effect.

## IV. The § 1374 Issue and the Government's Failure of Proof.

To recapitulate, the PSR calculated the actual tax loss caused by the conspiracy offense by determining how much corporate-level tax CMI would have paid under § 1374 of the 1954 Code if CMI, rather than Tucker individually, had sold the Plantation assets. The issue is whether that loss should have been calculated using § 1374 as amended by TRA and TAMRA.

A major purpose of TRA was to impose a corporate-level capital gains tax on subchapter C corporations that sell appreciated assets and liquidate.[4] To close a potential loophole in the new regime, TRA amended § 1374 to impose an equivalent corporate-level tax on a subchapter C corporation that files a subchapter S election before selling appreciated assets and liquidating. Presumably because Congress was focused on this specific problem, § 1374 as amended by TRA did not apply to corporations that had always been S corporations. See Pub. L. No. 99-514, § 632(a), 100 Stat. at 2276, codified at § 1374(c)(1). But that created another potential loophole -- the use of an existing S corporation to acquire appreciated assets from a C corporation in a tax free transaction and then sell them. This would avoid the new corporate-level tax, because amended § 1374 did not apply to existing S corporations. To close this loophole, TAMRA further amended § 1374 by adding § 1374(d)(8). Subsection (d)(8) clarifies that amended § 1374 applies *whenever* an S corporation disposes of assets the basis of which is "determined (in whole or in part) by reference

---

[4]See H.R. Conf. Rep. No. 99-841, at II-198-200, reprinted in 1986 U.S.C.C.A.N. 4075, 4286-88.

to the basis of such asset[s] . . . in the hands of a C corporation." Pub. L. No. 100-647, § 1006(f), 102 Stat. at 3405. Congress made the TAMRA amendments retroactive; they "take effect as if included in the provision of the Reform Act to which [they] relate." Id. § 1019(a), 102 Stat. at 3593.

So far, Tucker's argument for application of amended § 1374 looks strong. The merger of PCS into CMI followed by CMI's hypothetical sale of those assets looks like a subsection (d)(8) transaction, and the sale took place in January 1988, a full year after TRA became generally effective. But Tucker's argument founders on the specific effective-date provision governing the TRA amendments to § 1374. Those amendments "apply to taxable years beginning after December 31, 1986, *but only in cases where the 1st taxable year for which the corporation is an S corporation is pursuant to an election made after December 31, 1986.*" Pub. L. No. 99-514, § 633(b), 100 Stat. at 2277 (emphasis added). Although TAMRA further amended § 1374 to include tax free acquisitions of appreciated assets by existing subchapter S corporations, Congress again explicitly limited the effective date to "cases where the return for the taxable year is filed pursuant to an S election made after December 31, 1986." Pub. L. No. 100-647, § 1006(g), 102 Stat. at 3407. The government argues that CMI elected S corporation status in 1985 and therefore the TRA and TAMRA amendments do not apply by the plain language of their effective date provisions. The district court agreed, commenting at the sentencing hearing: "It seems to me the only way you could interpret it the way [Tucker] interpret[s] it is to take a big black marker and strike out the phrase that begins '. . . but only . . .'"

Tucker responds to this construction of the statutes with evidence that the IRS has consistently interpreted the reach of the TRA and TAMRA amendments in a contrary fashion. The IRS's enforcement policy was first broadcast in Announcement 86-128, 1986-51 I.R.B. 22, published on December 22, 1986, just days before TRA became effective. The purpose of this publication was to "inform[] taxpayers of the

manner in which regulations will clarify the application of [the § 1374 amendments] in five areas." The third area encompassed situations like the PCS merger into CMI. After correctly summarizing the TRA effective date provision in an introductory paragraph, the operative paragraph nonetheless announced that amended § 1374 would apply to certain transactions by pre-TRA S corporations:

> To prevent the use of the corporate reorganization provisions of the Code to circumvent the built-in gain tax, the regulations will provide that transferred basis property acquired by an S corporation from a C corporation or a former C corporation, such as transferred basis property acquired in a tax-free merger of a C corporation into an S corporation, generally is subject to the built-in gain tax notwithstanding that the transferee corporation always has been an S corporation . . . . For purposes of section 1374 of the Code, as amended by the Act, *the acquisition of such transferred basis property will be treated as a conversion to S corporation status as to that property.*

(Emphasis added.) Following Announcement 86-128, the IRS issued a number of private letter rulings that consistently applied the TRA amendments to pre-1987 S corporations that acquired assets with built-in gain from C corporations. See Priv. Ltr. Rul. 92-06-011 (Nov. 4, 1991); Priv. Ltr. Rul. 90-02-051 (Oct. 18, 1989); Priv. Ltr. Rul. 87-43-046 (July 28, 1987). Finally, in 1994, the IRS promulgated its long-promised regulations.[5] The regulations do not govern this case because they apply only to taxable years ending after December 27, 1994. See Treas. Reg. § 1.1374-10. But the regulations unmistakably adopt the policy announced in Announcement 86-128 that the TRA and TAMRA amendments apply to certain transactions by pre-1987 S corporations. See Treas. Reg. § 1.1374-8, example 1(i) (applying § 1374(d)(8) to an S corporation that elected S corporation status on January 1, 1986).

---

[5]Section 1374(e) authorizes the Secretary of the Treasury to "prescribe such regulations as may be necessary to carry out the purposes of" amended § 1374.

So that is the dilemma -- the IRS has consistently applied the TRA and TAMRA amendments in a manner contrary to the plain meaning of the statute, as construed by the district court. Of course, courts invalidate an agency's interpretation that is contrary to the plain language of a governing statute. But the tax laws are complex, and Congress works closely with the Treasury Department on tax matters. Therefore, Treasury Regulations construing the Internal Revenue Code are given great judicial deference, particularly long-standing interpretations that Congress has chosen not to modify. See National Muffler Dealers Ass'n, Inc. v. United States, 440 U.S. 472, 476-77 (1979); Norwest Corp. v. Commissioner, 69 F.3d 1404, 1408-09 (8th Cir. 1995), cert. denied, 517 U.S. 1203 (1996). Judges are understandably reluctant to conclude that they can discern the plain meaning of a tax statute when the agency charged with enforcing that statute considers it ambiguous. For example, in what was perhaps the last time this court held a Treasury Regulation invalid -- Western Nat'l Mut. Ins. Co. v. Commissioner, 65 F.3d 90 (8th Cir. 1995), construing another provision of TRA -- a unanimous Supreme Court later upheld the regulation in Atlantic Mut. Ins. Co. v. Commissioner, 523 U.S. 382 (1998).

At this point in the analysis -- with the opposing arguments as to which § 1374 should apply rather nicely balanced -- we conclude the government's failure to present affirmative evidence at sentencing is fatal to its position. The ultimate question is actual tax loss to the government. There is no loss to the IRS when a taxpayer takes a position the IRS chooses not to challenge. If CMI had sold the Plantation assets in January 1988 -- as the PSR assumed for purposes of calculating the loss -- its 1988 tax return would presumably have reported corporate-level taxable gain calculated under the more favorable TRA and TAMRA amendments to § 1374. What is missing in this record is testimony by a responsible IRS official that the agency would have asserted a deficiency based upon the applicability of old § 1374, *despite the contrary enforcement policy articulated in Announcement 86-128.* Absent credible evidence that the agency in fact would have taken this position, actual loss cannot be calculated

on this basis, even if the sentencing court concludes that the position, *if asserted,* would have been upheld. Here, there is good reason to infer that IRS would not have aggressively employed old § 1374 to capture more corporate-level tax in this case, because that inconsistent position might jeopardize the greater tax revenues it expected to gain from broadly applying the TRA and TAMRA amendments to § 1374. Thus, on this record, actual loss as determined in the PSR cannot be upheld.

## V. The Failure of Proof Is Material.

The district court ordered Tucker to pay $1 million in restitution, based upon an actual loss determination in the PSR that cannot be upheld. Tucker urges us to order restitution based upon the tax loss calculated by his accountant applying the TRA and TAMRA amendments to § 1374. The government argues that we must remand because it has evidence that will rebut the accountant's calculations. At sentencing, the district court ordered Tucker to present his evidence first and then rejected his loss theory as a matter of law. Because this obviated the need for government rebuttal, we agree the government is entitled to a new sentencing hearing on remand.

There is another reason why the case must be remanded for a new sentencing hearing. No witness has articulated the government's theory of tax loss. The present record suggests that Tucker and Marks conspired to reduce the capital gains taxes owing on the sale of Plantation assets in two ways. First, by removing those assets from CMI and transferring them to Tucker, the scheme avoided corporate-level tax altogether. That was the PSR's focus in ignoring the reversal of the PCS-CMI merger. But second, and probably more significant quantitatively, the fraudulent bankruptcy permitted the conspirators to claim a stepped-up basis when the assets were transferred to Tucker in exchange for his sham secured debt. CMI's carry-over basis in the Plantation assets was $1.21 million. On his 1988 individual return, Tucker claimed a basis of $7.28 million, permitting him to report a capital gain of only $4.47 million.

-10-

The difference in basis of $6.07 million, taxed at the effective 1988 capital gains rate of 28%, would yield an actual loss well in excess of the district court's $1 million restitution order, *even if the assets were sold by Tucker individually, not CMI.*

Our rough calculation of the apparent tax loss resulting from the fraudulent stepped-up basis led us to consider whether the district court's restitution order should be affirmed as a valid exercise of the court's discretion on this alternative ground. But we conclude that would be inappropriate. First, despite the apparent simplicity of focusing exclusively on the fraudulent stepped-up basis, the government has never asserted this theory of tax loss, so its simplicity may well be more apparent than real. Second, Tucker should have an opportunity to challenge this theory with a full tax analysis on a proper record.

Accordingly, the judgment of the district court is reversed and the case is remanded for further sentencing proceedings not inconsistent with this opinion. The government's motion to supplement the record on appeal is denied.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.