WORLDCOM, INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.

AT&T Corporation, et al., Intervenors.

Nos. 00–1002, 00–1062 and 00–1070.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 21, 2001.

Decided April 20, 2001.

Jonathan J. Frankel and Darryl M. Bradford argued the cause for petitioners. With them on the briefs were William T. Lake, Lynn R. Charytan, Dan L. Poole, Robert B. McKenna, Lawrence E. Sarjeant, Linda L. Kent, John W. Hunter, Julie E. Rones, Jodie L. Kelley, John J. Hamill, Thomas F. O'Neil III, Adam H. Charnes, Mark B. Erlich, Robert J. Aamoth, Albert H. Kramer, Renee R. Crittendon, Richard Martin Rindler, Charles C. Hunter and Catherine M. Hannan. John H. Harwood, II entered an appearance.

John E. Ingle, Deputy Associate General Counsel, Federal Communications Commission, argued the cause for respondents. With him on the briefs were Christopher J. Wright, General Counsel, Jonathan E. Nuechterlein, Deputy General Counsel, Laurence N. Bourne, Counsel, Catherine G. O'Sullivan, Nancy C. Garrison and Robert J. Wiggers, Attorneys, U.S. Department of Justice.

Daniel Meron argued the cause for intervenors AT&T Corporation, et al. With him on the brief were David W. Carpenter, Peter D. Keisler, David L. Lawson, Mark

C. Rosenblum, Robert J. Aamoth, Richard M. Rindler, Christy C. Kunin, Thomas F. O'Neil III, Adam H. Charnes, Mark B. Ehrlich, Jonathan J. Nadler, Rodney L. Joyce, Darryl M. Bradford, Jodie L. Kelley and John J. Hamill. James P. Young entered an appearance.

Dan L. Poole, Robert B. McKenna, Jr., William T. Lake, Lynn R. Charytan, Michael K. Kellogg, Mark L. Evans, Sean A. Lev, Aaron M. Panner, Roger K. Toppins, Lawrence E. Sarjeant, Linda L. Kent, John W. Hunter, Julie E. Rones, Michael E. Glover, Edward H. Shakin, Donna M. Epps and M. Robert Sutherland were on the brief of intervenors Qwest Communications International, Inc., et al. John H. Harwood, II, Gail L. Polivy, John F. Raposa, M. Edward Whelan, III, Alfred G. Richter, Hope E. Thurrott and James D. Ellis entered appearances.

Before: WILLIAMS, SENTELLE and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Packet-switching and digital subscriber line technologies ("DSL") make it possible to send data at high speed over conventional copper wire. Two DSL modems are attached to a telephone loop, one at the subscriber's premises and one at the telephone company's central office. If the line carries both ordinary telephone service and high-speed data transmission, the carrier must separate these streams at the company's central office, using a digital subscriber line access multiplexer. With this device the carrier sends ordinary voice calls to the public, circuit-switched telephone network (which keeps a phone line open during a voice call) and sends data traffic to a packet-switched data network (which compresses data and can send it in split-second bursts during gaps on a line), where it can then be routed to a corporate local area network or internet service provider ("ISP"). See *In re Deployment of Wireline Services Offering Advanced Telecommunications Capability*, 13 F.C.C.R. 24,012, 24,026–27 ¶¶ 29–31 (1998) (*"Advanced Services Order"*). The high-speed services thus provided are known as "DSL-based advanced services."[1]

At issue before us is the Federal Communications Commission's decision that "incumbent" local exchange carriers ("LECs"), when they provide such services, are subject to a range of special duties under the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 ("the Act"). These duties, to which we'll return in detail later, are intended to facilitate entry into local telephone markets. They include, for example, an obligation to provide competitors "access to network elements on an unbundled basis," and to offer, at wholesale rates, any telecommunications service that the firm offers at retail to subscribers other than telecommunications carriers. See 47 U.S.C. §§ 251(c)(3) & (4)(A).

In 1998, in response to a request for clarification from Qwest[2] and others, the Commission held that DSL-based advanced services constitute either "telephone exchange service" or "exchange access," and therefore were subject to the

---

1. In the order under review the Commission defined "advanced services" as "high speed, switched, broadband, wireline telecommunications capability that enables users to originate and receive high-quality voice, data, graphics and video telecommunications." *In re Deployment of Wireline Services Offering* *Advanced Telecommunications Capability*, 15 F.C.C.R. 385, 385 n. 2 (1999).

2. US WEST, Inc., the parent company of U.S. WEST Communications, Inc., merged with Qwest Communications International, Inc. on June 30, 2000.

duties set out in § 251(c). *Advanced Services Order,* 13 F.C.C.R. at 24,031–34 ¶¶ 38–44. On Qwest's petition for review in this court, the Commission sought a remand to address some of Qwest's arguments, which we granted. See *US West Communications, Inc. v. FCC,* 1999 WL 728555 (D.C.Cir.1999).

On remand the Commission again found incumbent LECs' provision of DSL-based advanced services to be subject to § 251(c) obligations. *In re Deployment of Wireline Services Offering Advanced Telecommunications Capability,* 15 F.C.C.R. 385 (1999) (the *"Remand Order"*). It invoked two theories to support its conclusion. The first interpreted the statutory language defining incumbent LECs, and the second, as in the original order, viewed DSL-based advanced services as either "telephone exchange service" or "exchange access." Because the Commission's reading of the statutory language defining incumbent LECs is at least reasonable, we deny Qwest's petition to vacate the entire Commission order. But because the Commission's interpretation of "telephone exchange service" and "exchange access" is in essence the one that we vacated and remanded in yet another case, *Bell Atlantic Telephone Cos. v. FCC,* 206 F.3d 1 (D.C.Cir.2000), we vacate and remand on that issue. We take the two theories in turn.

\* \* \*

■ *The definition of incumbent LEC.* Qwest concededly provides "telephone exchange service" and "exchange access" and under the statute is thus a "LEC" in the abstract. But Qwest argues that its DSL-based advanced services can be subjected to the duties created by § 251(c) only to the extent that those specific services belong to either of the categories that are the defining characteristics of a LEC. The language of the Act gives Qwest's analysis some purchase.

The Act defines incumbent LECs (naturally enough) as a subcategory of LECs. A LEC

> means any person that *is engaged* in the provision of telephone exchange service or exchange access. Such term does not include a person insofar as such person is engaged in the provision of a commercial mobile service under section 332(c) of this title, except to the extent that the Commission finds that such service should be included in the definition of such term.

47 U.S.C. § 153(26) (emphasis added). The concept of incumbency, by contrast, is based purely on history. An incumbent LEC with respect to an area is

> the local exchange carrier that—(A) on February 8, 1996, provided telephone exchange service in such area; and (B)(i) on February 8, 1996, was deemed to be a member of the exchange carrier association pursuant to section 69.601(b) of the Commission's regulations (47 C.F.R. 69.601(b)); or (ii) is a person or entity that, on or after February 8, 1996, became a successor or assign of a member described in clause (i).

47 U.S.C. § 251(h).

Qwest argues that the phrase in § 153(26) "is engaged in the provision of" plainly bars the Commission from regulating carriers' DSL-based advanced services under § 251(c) because such services are not "telephone exchange service" or "exchange access." Qwest interprets the second sentence in the LEC definition as confirming that services other than "telephone exchange service" or "exchange access," like commercial mobile services, are *excluded* from regulation. Under Qwest's reading, the second sentence states that "you are a local exchange carrier if you are engaged in providing telephone exchange service or exchange access, but you are not a local exchange carrier if you are engaged

in providing commercial mobile services." Oral Arg. Tr. at 10. In contrast, the Commission argues that DSL-based advanced services qualify as "telecommunications services" as to which § 251(c) imposes many of its duties on incumbent LECs, so that it may regulate a carrier engaged in providing such services so long as the carrier qualifies as a LEC by providing either "telephone exchange service" or "exchange access" and meets the definition of incumbent under § 251(h). See Respondent's Br. at 4 n.4, 19–20; Oral Arg. Tr. at 26 (Commission counsel acknowledging that a carrier must still be a "live LEC" to be an incumbent LEC). Under the Commission's reading, the second sentence of the LEC definition indicates that a carrier can be a LEC with respect to services other than "telephone exchange service" or "exchange access": the explicit exclusion of "commercial mobile service" (subject to an exception) lends some credence to the view that Congress's premise was inclusive. Congress, the Commission reasons, must have assumed that without the exclusion such persons would have been included *"insofar as"* they were "engaged in" providing mobile service merely on the basis of (elsewhere) providing exchange service or access, even if mobile service itself did not fit either category.

The statutory definitions do not compel Qwest's reading. There is nothing linguistically odd about defining a set of firms subject to regulation in terms of the conduct of particular activities, and yet also regulating some other activities that are not part of the definition. And the definition does not say that a carrier is a LEC only "when" or "to the extent" that it provides the regulation-triggering services. When defining a rural telephone company Congress specified inclusion *"to the extent that such entity"* was performing specified services, 47 U.S.C. § 153(37) (emphasis added), and similarly provided that a telecommunications carrier should

be "treated" as a common carrier *"only to the extent that it is engaged in"* providing telecommunications services," *id.* § 153(44) (emphasis added). These explicit specifications tend to undermine Qwest's argument that such a clause must be implied in the LEC definition. See *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983).

The Commission draws a similar argument from Congress's articulation of the § 251(c) duties. Those under § 251(c)(2) expressly apply to "telephone exchange service" or "exchange access," while the rest have no such limitation. These distinctions are hard to reconcile with the idea that the duties apply only to firms insofar as they provide "telephone exchange service" or "exchange access."

Given the ambiguity in the statutory language, our task is not to choose the best interpretation but merely to decide if the Commission's is reasonable. See *Atlantic Mutual Insurance Co. v. Commissioner of Internal Revenue,* 523 U.S. 382, 389, 118 S.Ct. 1413, 140 L.Ed.2d 542 (1998); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

Qwest suggests that the Commission's reading will produce absurd results, involving imposition of § 251(c) duties on incumbents' provision of long distance, wireless, and cable services. See Qwest's Main Br. at 17–18; see also *Mova Pharmaceutical Corp. v. Shalala,* 140 F.3d 1060, 1068 (D.C.Cir.1998). But the Commission's response alleviates much of this fear. See Respondent's Br. at 29–30. First, the worry about cable services seems inapplicable. The Act says that a "telecommunications carrier shall be treated as a common carrier ... *only to the extent* that it is engaged in providing telecommunications services." 47 U.S.C. § 153(44) (emphasis added).

Telecommunications services do not include conventional cable services (though the Commission has suggested that cable service used for high-speed internet access might be a different story). See *In re Inquiry Concerning High–Speed Access to the Internet Over Cable and Other Facilities,* 15 F.C.C.R. 19,287, 19,293–98 ¶¶ 14–24 (2000). And the § 251(c) duties have built-in limits that constrain their application to the other items (long distance and wireless). The interconnection obligations (and any related collocation duties) are by their terms restricted to telephone exchange and exchange access services. See 47 U.S.C. §§ 251(c)(2) & (6). The unbundling obligations of § 251(c)(3) (and likewise any related collocation duties) are constrained by the "necessary" and "impair" restrictions of 47 U.S.C. § 251(d)(2). See *Remand Order,* 15 F.C.C.R. at 391 ¶ 14. Only the duty of an incumbent LEC under § 251(c)(4), to offer at wholesale those telecommunications services that it sells at retail, seems unlimited; but in a competitive market the burden would be revenue-neutral, as retail prices should represent wholesale rates plus the additional costs needed for retailing.

Accordingly, we find no error in the Commission's conclusion that it can apply the § 251(c) duties to a firm that met the § 251(h) criteria on February 8, 1996 *and* is still providing "exchange access" or "telephone exchange service."

*Classification of DSL-based advanced services as "telephone exchange service" or "exchange access."* The Commission's alternative theory was that DSL-based advanced services actually constituted either "telephone exchange service" or "exchange access," depending on how the technology was used. Because the communications set in motion by ISP-bound traffic typically do not start and end within the same exchange, but proceed over the internet to out-of-exchange sites, the Commission

found that such traffic constitutes "exchange access." *Id.* at 391–92 ¶ 16. In contrast, the Commission found that work-at-home applications and other non-Internet communications (such as a corporate network) using DSL technology that begin and terminate within an exchange qualify as "telephone exchange service." *Id.*

■ Before addressing this, a few words about justiciability. As this theory was one of the Commission's two alternative bases for its ruling against Qwest, the company obviously had standing to seek its overthrow. Resolution of the first issue in the Commission's favor does not, under settled law, moot the challenger's attack on the second basis. See *Air Line Pilots Ass'n Int'l v. UAL Corp.,* 897 F.2d 1394, 1397 (7th Cir.1990). By considering both bases, there is obviously potential for economy by the inferior federal courts, as higher-level review might remove the first basis for the outcome. See *id.*

■ Further, there is a question of standing. The second (as yet unmentioned) petitioner, WorldCom, objects to the *Remand Order* on grounds that intersect with those of Qwest. Though WorldCom concurs with the Commission that DSL-based advanced services are "telephone exchange service" *or* "exchange access," it objects to the Commission's view that a customer's calls to a local ISP are "exchange access" because of the resulting out-of-exchange communications over the internet; if the calls are classified as "exchange access," WorldCom will not receive reciprocal compensation from incumbent LECs for them. Normally a party that has obtained the *result* that it sought in the agency proceeding cannot sue merely because it disagrees with the rationale, see *Telecommunications Research & Action Center v. FCC,* 917 F.2d 585, 588 (D.C.Cir.1990), and WorldCom most definitely favors the result here (the subjec-

tion of incumbent LECs' DSL-based advanced services to § 251(c) duties). It has been suggested, however, that such cases as *International Brotherhood of Electrical Workers v. ICC*, 862 F.2d 330, 334 (D.C.Cir.1988), and *Better Government Ass'n v. Department of State*, 780 F.2d 86, 91 (D.C.Cir.1986), might be read to hold that "despite a disposition which favors a given party it might still challenge a general rule if that rule remains in existence and creates cognizable harm through its effects on that party's future rights." *Telecommunications Research & Action Center*, 917 F.2d at 588 (Silberman, J., concurring). As the standing of one petitioner is enough, *Animal Legal Defense Fund, Inc. v. Glickman*, 154 F.3d 426, 445 (D.C.Cir.1998)(en banc), and Qwest has undoubted standing to attack the Commission's second theory, we need not pursue the suggestion.

 Our treatment of the merits can be brief. The Commission's *Remand Order* was issued a few months before our decision in *Bell Atlantic Telephone Cos. v. FCC*, 206 F.3d 1 (2000). There we held that the Commission, in arriving at the same conclusion for ISP-bound calls in *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996; Inter–Carrier Compensation for ISP–Bound Traffic*, 14 F.C.C.R. 3689, 3691–3703 ¶¶ 3–20 (1999), had "not provided a satisfactory explanation why LECs that terminate calls to ISPs are not properly seen as 'terminat[ing] ... local telecommunications traffic,' and why such traffic is 'exchange access' rather than 'telephone exchange service.'" *Bell Atlantic*, 206 F.3d at 9. The Commission does not seriously contest that its decision here, classifying certain DSL offerings as either "telephone exchange service" or "exchange access" under 47 U.S.C. § 153, relied not only on the *Reciprocal Compensation Order* vacated in *Bell Atlantic* but also on its defective reasoning, see *Re-*

*mand Order*, 15 F.C.C.R. at 391–92, 400–02 ¶¶ 15–16, 33, 35.

Accordingly we vacate and remand the Commission's classification of DSL-based advanced services as "telephone exchange service" or "exchange access." See *National Fuel Gas Supply Corp. v. FERC*, 899 F.2d 1244, 1249–50 (D.C.Cir.1990). Qwest's claim that incumbent LECs can be subject to § 251(c) duties only with respect to the provision of "telephone exchange service" or "exchange access," however, is denied.

*So ordered.*